ELIZABETH A. MATTHEWS *et al.*

*v.*

SAMUEL H. KERFOOT.

167    313
e114a¹595

*Filed at Ottawa April 3, 1897—Rehearing denied October 7, 1897.*

1. JURISDICTION—*probate court may exercise equitable jurisdiction in the settlement of estates.* In the settlement of estates the probate court may exercise jurisdiction equitable in its nature, and, where an estate is liable under a decedent's contract, may enter judgment against it.

2. CONTRACTS—*in construing contracts courts place themselves in the position of the parties.* In construing contracts courts will place themselves in the position of the contracting parties, that they may understand the language used in the sense intended by them.

3. SAME—*contract for sale of land construed.* A written contract whereby the owners of land agree, for a consideration, "to sell" an interest therein to one who is to take control of and sell the same without compensation, contributing one-half of all amounts expended for taxes, etc., turning over to the owners all proceeds from sales up to a certain amount, after which he is to receive a warranty deed for an undivided half interest in the lands unsold, and which is made obligatory on the heirs and personal representatives of each party, conveys an equitable interest in such land.

4. SAME—*forfeiture of contract not to be declared where parties appear to have waived the breach.* A contract will not be forfeited for an unimportant breach by one party, where it appears that at that time the other parties did not regard the breach as affecting the validity of the contract, but continued to treat it as in force.

*Matthews* v. *Kerfoot,* 64 Ill. App. 571, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

This is an appeal from a judgment of the Appellate Court affirming a judgment of the circuit court of Cook county. The facts may be briefly stated as follows: In 1868 the firm of Matthews & Cornwell, of Chicago, being the owners of the south-east quarter of the south-west quarter of section 25, township 40, north, range 13, east

of the third principal meridian, in the north-western part of the city of Chicago, entered into a contract with Samuel H. Kerfoot in regard to selling said land. This contract was acted upon by the parties until it was destroyed in the great fire in Chicago in October, 1871, but another contract was entered into soon after said fire, and dated back to June 1, 1871, which, it is claimed, is substantially like the contract entered into in 1868. Both parties recognized this contract, which is as follows:

"Memorandum of an agreement made and entered into this first day of June, 1871, by and between George L. Matthews and Darius K. Cornwell, composing the firm of Matthews & Cornwell, of the city of Chicago, Cook county, Illinois, of the first part, and Samuel H. Kerfoot, of the same place, of the second part:

"*Witnesseth:* That whereas the said Matthews & Cornwell are the owners of the south-east quarter of the south-west quarter of section 25, in township 40, north of range 13, east of the third principal meridian, in said Cook county, Illinois, subject, however, to an agreement made with the West Park Commissioners, by which the said Matthews & Cornwell were to deed the right of way over a strip of land one hundred and twenty-five feet in width, running east and west along the north line of said above described land, for boulevard purposes:

"Be it known, that in consideration of the sum of one dollar to the said Matthews & Cornwell in hand paid by the said Kerfoot, the receipt whereof is hereby acknowledged, the said Matthews & Cornwell, their heirs or assigns, agree to sell to the said Kerfoot, his heirs or assigns, an interest in said premises, on the following terms, to-wit: The parties hereto shall jointly and equally pay all taxes and assessments levied on said premises from, since and after the first day of January, 1868, as also all cost of grading streets or other improvements made or to be made on said premises by the joint consent of the parties hereto. The said Kerfoot shall

take sole care, charge and management of said premises, attend to the payment of taxes thereon, make sales thereof, collect moneys to come due on such sales, and, in fine, to do all that a resident and supervising agent should do towards the profitable and advantageous management and disposal of said premises, without fee or commission. All proceeds of sales of said premises or parts of said premises, after the payment of taxes and cost of improvements thereon, shall go into the hands of said Matthews & Cornwell, their heirs or assigns, until the aggregate amount of such sale shall reach the full sum of $25,980, with ten per cent interest thereon from the said first day of June, 1871. The said Matthews & Cornwell being thus fully paid, by cash and securities arising from such sales, the said sum of $25,980, with interest thereon as aforesaid, all parts of said premises then at the time of said payment remaining unsold, and all further proceeds of sales of any part of said premises remaining on hand or to be collected after the payment to said Matthews & Cornwell as above stated, shall be the joint property of and belong to the said Matthews & Cornwell, their heirs or assigns, an equal half, and to the said Kerfoot, his heirs or assigns, an equal half.

"It is expressly understood and agreed, that if, at the end of two years from the said first day of June, 1871, the said Matthews & Cornwell, their heirs or assigns, shall not have been paid the said sum of $25,980, with ten per cent interest as aforesaid, they shall have power to make sale of the whole or a part, as may be necessary, of said premises on the most advantageous terms for all concerned, and out of the proceeds of such sales shall pay all taxes and assessments legally levied on said premises and not then paid, all cost of improvements made on said premises but not paid for, and reserve to themselves the said sum of $25,980, with ten per cent interest as aforesaid, and divide any excess of land or proceeds, as before provided for, between said Mat-

thews & Cornwell one-half and said Kerfoot one-half. It being further agreed that one-half of any deficit arising from this transaction, by reason of the failure of the proceeds of sales to pay the said sum of $25,980 with interest as aforesaid, and any other moneys advanced by said Matthews & Cornwell for the joint account of the parties hereto in this connection, shall be paid to the said Matthews & Cornwell, their heirs or assigns, by the said Kerfoot, his heirs or assigns. After the payment of such moneys and securities to the said Matthews & Cornwell, their heirs or assigns, as before stated, any parts of said premises then unsold, or proceeds of sales then on hand, as before stated, shall belong to the said Matthews & Cornwell, their heirs or assigns, an equal half, and to the said Kerfoot, his heirs or assigns, an equal half. It being understood that on the full payment to said Matthews & Cornwell of the moneys, as aforesaid, a conveyance by special warranty deed, with full dower right therein, will be made by them to said Kerfoot of an equal undivided half of any portion of the said land then remaining unsold, and a transfer will be made by them to said Kerfoot of one-half of said proceeds and securities then remaining on hand. All moneys to pay taxes, make improvements, and in any way expended in behalf of said property, to be advanced at the time of the expenditure by said Matthews & Cornwell one-half and said Kerfoot one-half. It is understood and agreed that no sale of the whole or a part of the joint interests of the parties hereto in said premises shall be made within two years from the said first day of June, 1871, without the joint consent of the parties hereto. It being understood that the rights and obligations hereunder shall extend to and be obligatory upon the heirs and legal representatives of the respective parties hereto."

Kerfoot, it is conceded, performed his part of the contract up to and including 1877, except that he made no advances for taxes after the year 1874, the land being

sold for taxes in 1875 and 1876, and was redeemed August 29, 1877, by Matthews & Cornwell, Kerfoot failing to contribute any part towards the redemption. Kerfoot received one offer of $80,000 for the land from James M. Allyn in the fall of 1872, but Matthews, one of the owners, refused to make the sale. Kerfoot also had an offer of $90,000 in September, 1872, but the contract was not consummated by reason of an abstract of title not being procured in time for the purchaser. A letter from Matthews & Cornwell, bearing date September 10, 1877, stated that if he, Kerfoot, would pay his share of the taxes they would pay theirs, and they notified Kerfoot they would hold him responsible for the cloud he threw upon the title by allowing the land to be sold for taxes. After 1877, and until April, 1886, Matthews & Cornwell looked after the property so far as it was necessary, and on April 8, 1886, sold the land through one Weal, a real estate broker, to George A. Severns for $93,500, and from this purchase price they paid Weal $2000 for making the sale. Matthews & Cornwell received cash $23,500 and Severns' note for $70,000, bearing six per cent interest, and due in five years, secured by trust deed on the land. George L. Matthews died February 11, 1890, and letters of administration were issued February 17, 1890, by the probate court of Cook county. The note has been paid except $30,000 and interest from April 8, 1895, the time of payment having been extended from time to time. It was arranged between the executors of Matthews and Cornwell that one-half of this $30,000 is due the estate of Matthews and one-half due Cornwell. It appears that in 1873 a panic occurred in Chicago, and from 1874 to 1880 this property was hardly worth the amount paid for it, $25,980, and interest, and the advances made by Matthews & Cornwell, and there was no market for the property during that time, though it does not appear that Matthews & Cornwell made any special efforts to sell the property until a short time before the sale was made

to Severns. No proceedings were taken by Matthews & Cornwell to cancel or forfeit the contract with Kerfoot. Kerfoot, on June 19, 1873, assigned as collateral security his interest in the contract to the Third National Bank of Chicago, but settled with the receiver of the bank and received back the contract December 18, 1894. Just before the expiration of the two years from the issuance of the letters of administration Kerfoot filed a claim in the probate court of Cook county against the estate of George L. Matthews for $16,040.95, as due him under the contract. The probate court disallowed the claim, and the claimant, Kerfoot, appealed to the circuit court of Cook county, which held that he was entitled under the contract to $17,845.15, and judgment was entered upon the finding. The estate of George L. Matthews appealed to the Appellate Court for the First District, where the judgment of the circuit court was affirmed.

MATTHEWS & HUGHES, for appellants:

An agreement to alter a contract under seal must itself not only be in writing, but also under seal. *Chapman* v. *McGraw*, 20 Ill. 101.

A contract to sell land is an executory contract. *Laflin* v. *Howe*, 112 Ill. 253.

A contract is executory when the thing agreed has not been done; it is executed when the thing has been done. Bishop on Contracts, sec. 624.

Rescission may be effected on the part of him who has the right by simply notifying the other of his intention, and such notice need not always be express, but may be constructive. 21 Am. & Eng. Ency. of Law, 72.

There may be various other circumstances or acts of a party which will constitute rescission. 21 Am. & Eng. Ency. of Law, 74.

Rescission of a contract may be done by some act inconsistent with its continued existence. 21 Am. & Eng. Ency. of Law, 84.

Where a contract is executory on both sides, upon non-performance by one party the other may treat it as rescinded. *School District* v. *Hayne,* 46 Wis. 511.

The failure of one of the parties to fulfill the agreement authorizes the other party to refuse to perform without liability for breach. *Graham* v. *Halloway,* 44 Ill. 385.

JOHN P. AHRENS, for appellee:

The probate court has a sort of equitable jurisdiction over claims presented before it. *Hurd* v. *Slaten,* 43 Ill. 348.

Every partnership debt being joint and several, resort may be had in the first instance for the debt to the surviving partners or to the assets of the deceased partner. *Ladd* v. *Griswold,* 4 Gilm. 25; *Mason* v. *Tiffany,* 45 Ill. 392.

In the construction of written contracts the intention of the parties who make the contract is to be determined from the whole instrument, and when the intention can be ascertained it is the duty of the courts to carry it into effect. *Massie* v. *Belford,* 68 Ill. 290.

It is one of the cherished objects of the law to maintain a reciprocity between parties to a contract, whenever it can be done without doing violence to the language used. *Robinson* v. *Stow,* 39 Ill. 568.

Mr. JUSTICE CRAIG delivered the opinion of the court:

The real question in this case is, what were the rights of the parties under the contract set out in the foregoing statement? The claimant's contention is, that by the terms of the contract there was vested in him an interest in the land described in the contract and in the proceeds arising therefrom after the sale of the land, and that the contract was a valid and subsisting one April 8, 1886, when the land was sold to George A. Severns. The contention of the executors of the estate of George L. Matthews, defendants in the probate court of Cook county, where the claim was filed first, and appellants here, is, that Kerfoot had abandoned the contract before the sale.

It was held in *Doggett* v. *Dill*, 108 Ill. 560, that the probate court, in the matter of claims against estates, exercises a jurisdiction equitable in its nature, and if the estate is liable under the contract, judgment could be entered against the estate. (*Hurd* v. *Slaten*, 43 Ill. 348; *Mason* v. *Tiffany*, 45 id. 392.) The question whether the contract gave Samuel H. Kerfoot an equitable interest in the land and an interest in the proceeds arising from the sale thereof must be determined from the construction of the contract, and whether it was the intention of Matthews & Cornwell, the parties thereto, that Kerfoot should acquire an equitable interest in the land.

Courts, in construing written contracts, endeavor in all cases to place themselves in the position of the contracting parties, so that they may understand the language used in the sense intended by the persons using it. (*Doyle* v. *Teas*, 4 Scam. 202.) The object of Matthews & Cornwell, the owners of the land, was to place the land upon the market. They interested Kerfoot in the matter and made the contract with him. The contract, after reciting that Matthews & Cornwell are the owners of the south-east quarter of the south-west quarter of section 25, township 40, north of range 13, east of the third principal meridian, etc., says: "Be it known, that in consideration of the sum of one dollar to the said Matthews & Cornwell in hand paid by the said Kerfoot, the receipt whereof is hereby acknowledged, the said Matthews & Cornwell, their heirs or assigns, agree *to sell* to the said Kerfoot, his heirs or assigns, *an interest* in said premises on the following terms." It then provides that the parties shall jointly and equally pay all taxes and assessments levied on said premises from, since and after the first day of January, 1868, as also all costs of grading streets or other improvements made or to be made on the premises by the joint consent of the parties hereto; that the said Kerfoot shall take sole care, charge and management of said premises, attend to the payment of taxes

thereon, make sales thereof, collect moneys to come due on such sales, and, in fine, to do all that a resident and supervising agent should do towards the profitable and advantageous management and disposal of said premises, without fee or commission; that the proceeds of sales made by Kerfoot, after the payment of taxes and cost of improvements, are to go into the hands of Matthews & Cornwell, until the aggregate amount of such sale shall reach the sum of $25,980, with ten per cent interest thereon from the first day of June, 1871; that after the said Matthews & Cornwell are fully paid, by cash and securities arising from such sales, the sum of $25,980, with interest, all parts of said premises then at the time of said payment remaining unsold, and all further proceeds of sales of any part of said premises remaining on hand or to be collected after the payment to Matthews & Cornwell, as above stated, shall be the joint property of and belong to the said Matthews & Cornwell, their heirs or assigns, an equal half, and to the said Kerfoot, his heirs or assigns, an equal half; that at the end of two years from the first of June, 1871, if Matthews & Cornwell should not be paid the sum of $25,980, with ten per cent interest, they should have the power to make sale of the whole or such part as may be necessary, on the most advantageous terms for all concerned, and out of the proceeds of such sales should pay all taxes and assessments legally levied on said premises and not then paid, and all costs of improvements made on said premises but not paid for, and reserve to themselves the said sum of $25,-980, with ten per cent interest, and divide any excess of land or proceeds, as before provided for, between said Matthews & Cornwell one half and said Kerfoot one-half; that one-half of any deficit arising from the transaction by reason of the failure of the proceeds of sales to pay the said sum of $25,980, with ten per cent interest, and any money advanced by said Matthews & Cornwell for the joint account of the parties in that connection, should

167—21

be paid to the said Matthews & Cornwell, their heirs or assigns, by the said Kerfoot, his heirs or assigns; that after the payment of the moneys and securities to the said Matthews & Cornwell, any parts of the said premises then unsold, or proceeds of sales, shall belong to Matthews & Cornwell an equal half and to Kerfoot an equal half; that when Matthews & Cornwell are fully paid, then a special warranty deed shall be made to Kerfoot of one-half of any land then remaining unsold; that all moneys for taxes, improvements or in any way needed on behalf of said property were to be advanced by Matthews & Cornwell one-half and said Kerfoot one-half; that no sale of the land for a period of two years from June 1, 1871, was to be made without the general consent of all parties; that the contract was to extend to and be obligatory upon the heirs and legal representatives of the parties. The contract was under seal and was duly acknowledged.

If we give to words their plain, natural and obvious meaning, as used in this contract, we can come to no other conclusion than that it was the intention of the parties that Kerfoot should have an interest in the land and the proceeds thereof after the payment of the $25,-980, and ten per cent interest thereon, and the taxes, etc., paid by Matthews & Cornwell. They expressly agree *to sell an interest in the land.* They receive a *consideration in money* for it. Matthews & Cornwell and Kerfoot are to *jointly* and *equally* pay all taxes and assessments, and after the payment to Matthews & Cornwell of a certain amount, all proceeds of sales are to be the *joint property* of Matthews & Cornwell and Kerfoot, each one-half. A special warranty deed was to be made by Matthews & Cornwell to Kerfoot of an equal undivided half of any portion of land remaining unsold, Kerfoot being compelled to pay Matthews & Cornwell any deficit arising by reason of the failure of the proceeds of sales to pay the $25,980, with ten per cent interest, and any moneys

advanced by Matthews & Cornwell for the joint account
of the parties. The extending the rights and obligations
to the heirs and legal representatives of the parties sat-
isfies us that any other construction would do violence
to language and be inconsistent with the meaning in-
tended by the parties. If Kerfoot was to have no equi-
table interest in the land,—no interest in the proceeds
from the sales,—why did the parties use the language,
"agree to sell to the said Kerfoot an interest in said prem-
ises?" Why should "all parts of said premises remaining
unsold, and all further proceeds of sales, * * * be
the joint property of and belong to the said Matthews &
Cornwell, their heirs or assigns, an equal half, and to the
said Kerfoot an equal half?" Kerfoot was to receive no
fee or commission, and it is improbable that he would
obligate himself to pay a deficit in the $25,980, and ten
per cent interest, and half of taxes and improvements,
and be compensated out of expected profits.

The case of *Barling* v. *Peters*, 131 Ill. 78, is similar, and
sustains the view we have taken of the contract in this
case that Kerfoot acquired an equitable interest in the
land and in the proceeds arising therefrom.

The appellants contend that the contract was aban-
doned by Kerfoot long before the sale. From 1871 to
1874 Kerfoot performed his part of the contract, looked
after the property and paid his part of the taxes. He
found two persons who made offers for the land. One
purchaser offered $80,000, but Matthews declined to sell
at the price offered. The other purchaser offered $90,000,
but the sale was not consummated because an abstract
of title was not procured in time. Fences were built,
streets graded, taxes paid and the land rented for grass
up to and including 1877 by Kerfoot, but Kerfoot made
no advances for taxes after the year 1874. The land was
sold for taxes in 1875 and 1876, but was redeemed by
Matthews & Cornwell August 29, 1877, Kerfoot failing
to contribute any part towards the redemption from the

sales. The taxes for the years from 1875 to 1885 inclusive were paid by Matthews & Cornwell. By the terms of the contract, after the expiration of two years from June 1, 1871, Matthews & Cornwell had the right to sell the land themselves, the whole or a part, on the most advantageous terms for all concerned, and out of the proceeds of such sales pay all taxes and assessments legally levied and not then paid, all costs of improvements made but not paid for, and reserve to themselves the sum of $25,980, with ten per cent interest, and divide any excess of land or proceeds, as before provided for, between Matthews & Cornwell one-half and said Kerfoot one-half. This seems to imply that Matthews & Cornwell should make payments on joint account, when taken in connection with the clause of the contract that one-half of any deficit arising from the transaction by reason of the failure of the proceeds to pay the said sum of $25,980, with interest, and any other moneys advanced by said Matthews & Cornwell for the *joint account* of the parties to the contract, should be paid to the said Matthews & Cornwell, their heirs or assigns, by the said Kerfoot. From 1874 to 1880 the property would not have sold for the amount of the investment and the advances made by Matthews & Cornwell. In fact, one witness testified this property, in common with all other acre property, was absolutely unsalable from 1874 to 1879. If anybody wanted it, it might have sold for $400 or $500 an acre. This must have been known to Matthews & Cornwell, and it is evident they did not desire to sell during that period, as there is no evidence showing an offer to sell the property by Matthews & Cornwell until the property was sold to Severns by a real estate broker, April 8, 1886. The letter of Matthews & Cornwell dated September 10, 1877, asking Kerfoot to pay his share of the taxes for the years 1875 and 1876, says nothing about forfeiting the contract, but shows that they regarded the contract in force at that time, for they say, "unless you do this

we shall hold you responsible for the cloud you throw over the title by allowing the land to be sold for taxes." There is no provision in the contract that if Kerfoot fails to perform his part under the contract he shall forfeit his rights, and no steps were taken by Matthews & Cornwell to forfeit Kerfoot's rights under the contract, and when Kerfoot notified them by letter of April 15, 1886, that neither the officials of the Third National Bank nor the receiver had any claim or interest in the contract, Matthews & Cornwell replied giving the terms of the sale they had made to Severns for $93,500, the amount of cash they had received and the commissions they had paid the real estate broker who made the sale, but said nothing about forfeiting the contract or its not being in force. These facts and circumstances are inconsistent with appellants' claim that Kerfoot had abandoned the contract before the sale was made. Matthews & Cornwell had the right to make the sale themselves, if, at the end of two years from June 1, 1871, they had not been paid the $25,980, on the most advantageous terms for all concerned. They had the right, out of the proceeds, to pay all taxes and costs of improvements, and reserve to themselves the $25,980, with ten per cent interest thereon, and divide any excess of lands, or proceeds, one-half to Matthews & Cornwell and one-half to Kerfoot. It was most advantageous for all concerned to wait as they did for a better market. This, no doubt, they preferred to do for the best interests of all concerned.

From these considerations we arrive at the conclusion that Kerfoot had an equitable interest in this land, and from the conduct of the parties it continued until the land was sold, and it was within the power of the court to fully reimburse Matthews & Cornwell by taking from the proceeds of the sale the portion of the taxes which Kerfoot failed to pay, and make the performance by Kerfoot a substantial performance under the contract.

From the construction we have placed upon the contract the propositions of law submitted to the circuit court did not announce correct principles of law, and were properly refused.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*